(No. 5357

ERNEST DEWEESE, Claimant, vs. STATE OF ILLINOIS, DEPT. OF PUBLIC SAFETY, Respondent.

*Opinion filed March 22, 1973.*

WISEMAN, HALLETT, MOSELE, SHAIKEWITZ AND STRUIF, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; LEE D. MARTIN, Assistant Attorney General, for Respondent.

BURKS, J.

This is an action for damages to compensate claimant for permanent personal injuries he suffered while he was an inmate at Menard Penitentiary, injuries allegedly caused and aggravated by negligence of the respondent.

The accident which resulted in claimant's injuries oc-

curred on a Sunday morning, May 29, 1966, in the vegetable house of the penitentiary at Chester. Claimant was then and there assigned to the job of operating and then cleaning a potato dicing machine. The accident happened while he was cleaning the machine.

Claimant contends that he was following the proper method of cleaning the machine as he had previously been instructed; that he had just turned off the master switch located on an angle iron frame near the machine; pulled the plug, and wrapped the cord around a pipe. Then he stuck his hand into the chute to clean out potatoes lodged there so they wouldn't fall on the floor when he disassembled it. As his right hand was up into the chute, the machine suddenly turned on, seriously injuring claimant's right hand.

Claimant states that the machine was about four feet beyond the angle iron frame where the plug and switch were, and he did not see who plugged in the machine and turned on the switch.

Claimant said that on several previous occasions, and twice within the month before his injury, he had complained to the guards that various inmates were attempting to turn on the machine while he was cleaning it. Other claimant inmate witnesses, and even one of the respondent's witnesses, state that there was this type of horseplay carried on in the vegetable house. The claimant and two of his witnesses testified that the guards had knowledge of this, but permitted it to continue. It was undenied that Officer Grecco, who had charge of the vegetable house, had answered claimant's complaints by laughing and stating, "You guys have got to learn to look out for yourselves."

Claimant contends that the guard's failure to heed his repeated complaints, and other inmates' complaints, concerning the horseplay around the potato dicing machine and to take no steps to prevent such dangerous activities, displayed a lack of due care for the safety of the inmates;

that respondent's failure to supervise properly and to keep adequate control over the area to prevent other inmates from turning the machine on while claimant was cleaning it, constitutes actionable negligence on the part of the respondent.

Respondent denies that a prankster turned the machine on while claimant was cleaning it since no witness could or would testify that he actually saw this happen. Respondent argues that the only logical theory that can be assumed is that claimant caused his own injury by putting his hand into the potato slicer while it was in operation.

In support of its position, respondent relies heavily on the testimony of Officer Samuel Joseph Grecco who was in charge of the vegetable house where claimant was injured. Although Officer Grecco was not present or on duty on the day of the accident, he returned to his job the following day and made an investigation of the accident. Officer Grecco had been in charge of the vegetable house for a long time; had personally trained the claimant, DeWeese, in the proper method of operating and cleaning the potato dicing machine; and that he specifically ordered the claimant never to clean the machine or put his hand in the chute while the machine or the motor was running.

Officer Grecco testified that, in spite of his strict orders, five or six times before this accident, he found the claimant trying to clean the machine while it was still running by putting his hand up the chute. Each time, Officer Grecco said, he told the claimant he shouldn't do this and each time the claimant would answer, "I know what I am doing."

The court must first decide a disputed question of fact. Did the claimant cause his own injury by negligently putting his hand in the cutting chute while the machine was running? Or did some other person turn on the machine while claimant's hand was in the chute to clean it?

Before resolving this question of fact in favor of the

claimant, we carefully analyzed the voluminous record to determine the probable motives and the credibility of the witnesses as well as the fairness of the exhibits offered as evidence.

The six witnesses who testified for the respondent, on the question of the cause of the accident, were all to some degree under the control of the respondent. Four of the witnesses were inmates doing time and working under the supervision of Officer Grecco. There is a strong inference in the record that these witnesses had been coached by the respondent. Officer Grecco admitted that he talked to each inmate witness just before they testified. Respondent's other two witnesses, on the question of cause, were Officers Grecco and Hasten. Neither were present in the room when the accident occurred. Both are employees of the respondent.

By contrast, two witnesses for the claimant were former inmates who worked in the vegetable house with the claimant at the time of the accident but had been discharged from prison prior to the hearing. They were under no duress that might influence their testimony. Both former inmates, Everett Milligan and Willis Kissee, testified that, just prior to claimant's injury, they had seen inmates turn on machines to frighten other inmates, including the claimant, on numerous occasions. They both said that this type of prank was a common occurrence in the vegetable house and that the guards knew it.

Milligan said he was standing 10 or 12 feet from the claimant when the accident occurred. Immediately before the injury, he saw the claimant standing by his machine and he knew the machine was stopped because he didn't hear any noise from it. Milligan said the potato dicing machine is a noisy machine. He heard the machine click on, saw that claimant's hand was in it. Milligan did not see anyone turn the machine on because his eyes were on the injured claimant. "The room was cluttered, and I jumped over some vats

to get to claimant's machine to unplug it or throw the switch," Milligan said.

Further shaking the credibility of respondent's theory were 3 enlarged photos of the potato dicing machine, the plug, the cord, the switch, and the surrounding area which respondent offered in evidence. These photo exhibits are deliberately misleading. They do not show the machine in the same location that it was in at the time of claimant's injury. This was admitted by most of respondent's own witnesses. The photos show the machine touching the post to which the plug and switch are attached. At the time of the accident the machine was located three or four feet away from the switch and in such position that the operator would have his back towards the switch. In that location, it would have been nearly impossible for the claimant, while cleaning the machine, to observe a prankster turning it on.

We are also forced to take an incredible view of Officer Grecco's testimony. He said, and we agree, it is not customary for an inmate to talk back to a guard who has given the inmate a warning for violating an order. Yet, this officer said that five or six times before the accident, he had seen the claimant violate his order not to clean the machine while it was running; that he warned the claimant not to do this each time he saw it; and that each time the claimant said, "I know what I am doing." Nevertheless, Officer Grecco said that he doesn't recall ever having punished the claimant or writing a ticket for him for talking back to an officer or for violating the rules. If Officer Grecco's statements are true, it would seem to compound and confirm claimant's charge of negligent supervision of the vegetable house.

Finally, even if the guards are negligent in enforcing the rules, we find it hard to believe that an inmate, who has had adequate instruction and experience in operating a potentially dangerous machine, would intentionally put his hand in the cutting chute while the noisy machine is in oper-

ation, particularly when he could turn it off by a flip of the switch. It could hardly be seriously argued that the inmate was in a hurry to finish his job because he had someplace better to go.

On the first of claimant's contentions, we conclude that the carelessness and negligence of the guards in the supervision of the vegetable house was the proximate cause of claimant's injury in the potato dicing machine.

In *Moore* vs. *State, 21 C.C.R. 282,* we held that assigning a convict without proper instructions to work on a food grinder which was not equipped with a hopper amounts to actionable negligence. Following the same reasoning, the facts before us fully support an award to the claimant.

We do not follow *Moore* to the extent of holding that the doctrine of contributory negligence would not apply to inmates under certain circumstances. We specifically held that it did apply in *Moe* vs. *State, 23 C.C.R. 14.* In *Moe* the claimant filed to sustain burden of proof that he was free from contributory negligence when cleaning the rollers on a soap grinding machine with a brush while it was in operation.

Here the facts are clearly distinguishable. We find the claimant free from contributory negligence.

We also reject respondent's argument that the "fellow servant rule" would relieve respondent from liability if we hold, as we have, that the machine was turned on in an act of horseplay by another inmate.

In Illinois the "fellow servant rule" applies only to employees "engaged in direct co-operation in the work of a common employer." *I.L.P. Employment §132.* This court has held that a convict is not an employee within the meaning of the Workmen's Compensation Act, *Tiller* vs. *State, 4 C.C.R. 243;* nor within the meaning of the Health and Safety Act, *Moore* vs. *State, 21 C.C.R. 282.* The basis of our ruling in these cases is that the employment relationship

contemplated by the statutes [and in the case law cited in I.L.P. (supra)] is a voluntary one for wages, a relationship terminable by either party. A convict cannot meet such a test. He is an involuntary captive in the penitentiary. His life and movements are controlled by the respondent. We hold that the "fellow servant rule" is not applicable here.

We turn now to the nature, extent and permanency of claimant's injuries.

When claimant's right hand was removed from the potato cutting machine, his index finger was severed at the first joint, the skin on his middle finger and ring finger was ripped off to the bone; the fingers were badly mangled and he suffered a deep gash on his palm immediately below the fingers.

Claimant contends that the medical treatment and hospital care he received from prison officials and inmate nurses, following his injury, were so grossly negligent that his permanent injuries, disabilities and disfigurement were increased in severity; and that he endured unnecessary pain and suffering. If so, this would constitute a separate cause of action against the respondent even if we had held the respondent not liable for the claimant's original injury. See *Witte* vs. *State, 21 C.C.R. 173.*

Having held that respondent's negligence was the proximate cause of claimant's injury in the vegetable house, it is not necessary for us to analyze in detail this voluminous record concerning his post-injury treatment in the prison hospital by the inmate nurse, and by the prison physicians. Suffice to say, claimant is entitled to an award for his total injury.

After the accident, claimant was taken to the prison hospital by inmate Charles Clutter. There, claimant's wounds were sutured on the three fingers involved by Dr. Donald Wham, the prison physician. Dressing was applied

and instructions were given to inmate nurse Hornbuckle to change the bandages, cleanse the hand daily, and to give medication for pain. It appears from the record that nurse Hornbuckle totally failed to follow any of these instructions and subjected the claimant to various forms of inhumane treatment. The State never called Hornbuckle as a witness to deny these charges. Three days after the lacerations were sutured by Dr. Wham, a surgeon from Chester, Dr. Milton Zemlyn, amputated the three middle fingers. This left the claimant with a thumb and little finger on his right hand plus the stumps of the three middle fingers which were amputated.

Some three months later, on September 20, claimant was released from prison. Five months after his release, on February 11, 1967, claimant's hand was examined by a private physician and surgeon, Dr. Robert Tatkow of St. Louis. Dr. Tatkow, whose qualifications as an expert in orthopedic surgery is stated in the record, testified for the claimant by deposition taken at his office. In his practice Dr. Tatkow has had experience in evaluating hand and finger injuries for workmen's compensation cases. When Dr. Tatkow examined the claimant nearly 10 months after the fingers were amputated, claimant was complaining of sensitiveness of the hand, particularly in cold weather, and pain in the stumps of the second, third and fourth fingers of the right hand. We quote the following questions and answers from the doctor's testimony:

"Q Doctor, medically, what do you attribute this pain to in the various portions of claimant's hand?

"A There is usually varying amounts of sensitivity at the end of stumps from amputated fingers for a long period of time, until the bone ends seal off and until the tissues at the end of the stumps become soft and malleable enough to withstand the pressures of use.

"Q Do you have an opinion, based upon a reasonable degree of medical certainty, as to how long it will take the stumps to become more immune to the touch? In other words, so there will be less pain?

"A This is impossible to say."

The doctor also said, "There was also a brownish coloration of the entire palm of the hand and right thumb, the etiology of which I'm not certain." Dr. Tatkow especially mentioned the smallness of the webbing between the fingers on the injured hand as being significant. "The combination of the short stumps and the decreased depth of the web space made picking up objects difficult, if not impossible." Claimant is right handed. The permanent loss of function of his right hand is approximately forty to fifty per cent, according to Dr. Tatkow.

There is no doubt that claimant's earning power has been affected and that he has lost some job opportunities as a result of his injury, as he alleges.

This brings us to the difficult question of determining the amount of claimant's award. Our courts have stated that "there is no fixed rule of compensation in damages for personal injuries, and that compensation is incapable of exact mathematical calculation." *Swearinger* vs. *Kinger (1968) 91 Ill.App.2d 251.*

Our court follows the rule stated in *I.L.P. Damages §140*: "The measure of compensatory damages is such sum as will compensate the person injured for the loss sustained, with the least burden on the wrongdoer (State) consistent with the idea of fair compensation." We must also bear in mind that, at the time of claimant's injury, the legislature had fixed a limit of $25,000 on any award that may be allowed for personal injuries regardless of their severity.

For further guidance, we have reviewed a long list of cases from this and other jurisdictions containing court-computed damage awards for injuries similar to the claimant's. The wide range in the amounts awarded confirms the statement in *Swearinger* (supra). In *22 Am.Jur.2d, Damages §380,* we find the following awards made to prisoners for hand injuries:

"—$35,000 awarded by court without jury; 15-year-old boy; inmate of state correctional institution; right hand caught in electric printing press and crushed with loss of index, middle, and little finger; thumb stiff, tip of ring finger missing; loss of 70 to 80 percent use of hand; together with disfigurement of hand. *MacDonald* vs. *State (RI) 187 A2d 519.*"

"—$6,000 awarded by court to 30-year-old prisoner who had worked as welder; traumatic amputation of all or part of four fingers causing 50 percent loss of use of right hand. *Colley* vs. *State, 2 Misc 2d 545, 152 NYS2d 968.*"

Considering all of the facts and circumstances in the case before us, we conclude that an award for damages to the claimant in the amount of $17,500 would be fair and reasonable.

Claimant, Ernest DeWeese, is hereby awarded damages for his personal injuries in the total sum of $17,500.00.